Ana Liz SALGADO–CANDELARIO, Plaintiff,

v.

ERICSSON CARIBBEAN, INC., et al., Defendants.

Civil No. 04–2351 (ADC).

United States District Court, D. Puerto Rico.

Sept. 18, 2008.

Etienne Totti–Del–Valle, Cristina A. Fernandez–Rodriguez, Totti & Rodriguez Diaz, Hato Rey, PR, for Plaintiff.

Javier G. Vazquez–Segarra, Goldman Antonetti & Cordova, San Juan, PR, for Defendant.

### OPINION AND ORDER

AIDA M. DELGADO–COLON, District Judge.

Plaintiff, Ana Liz Salgado–Candelario ("plaintiff") filed this suit against Ericsson Caribbean, Inc. ("Ericsson"), Carla E. López ("López") and an unidentified insurance company (collectively, "defendants"), alleging that defendants: failed to provide her with reasonable accommodations; discriminated against her because of her disability, gender, race and national origin; retaliated against her for complaining about defendants' discriminatory conduct; and retained information and/or documentation about her stock options and deferred compensation benefit plan. **Docket No. 1.** Plaintiff's claims are made pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"), the Civil Rights Act of 1991, 42 U.S.C. § 1981a ("section 1981a"), Puerto Rico's Law No. 80 of May 30, 1976, 29 L.P.R.A. § 185a *et seq.* ("Law 80"), Law No. 100 of June 30, 1959, 29 L.P.R.A. § 146 *et seq.* ("Law 100"), Law No. 44 of July 2, 1989, 1 L.P.R.A. § 501 *et seq.* ("Law 44"), Law No. 69 of July 6, 1985, 29 L.P.R.A. § 1321 *et seq.* ("Law 69"), Law No. 115 of December 20, 1991, 29 L.P.R.A. § 194 *et seq.* ("Law 115"), and Article 1802 of the Puerto Rico Civil Code, 31 L.P.R.A. § 5141 ("Article 1802").

Now before the Court are: (1) plaintiff's objections **(Docket No. 81)** to the Report and Recommendation ("R & R") **(Docket No. 74)** issued by Magistrate–Judge Camille L. Vélez–Rivé ("Magistrate–Judge") on June 4, 2008, which recommended granting defendants' motion for summary judgment; and (2) arguments raised in defendants' motion for summary judgment, but left unaddressed in the R & R. **Docket Nos. 28, 31.** After reviewing the R & R, objections, pleadings, statements of fact, and exhibits, the Court adopts the R & R in part and rejects it in part. Moreover, the Court grants in part and denies in part defendants' motion for summary judgment as to the remaining claims.

## I. Factual Background and Procedural History

Unless otherwise noted, the following relevant facts are derived from the parties' statements of fact. The facts are construed in the light most favorable to the non-moving party.

### A. Pre–Injury Employment

Plaintiff began working for Ericsson on January 24, 2000, as an Assistant Comptroller.[1] Defendants' Statement of Uncontested Material Facts, **Docket No. 28–3,** ("DSUMF") at ¶ 2; Plaintiff's Opposing Statement of Material Facts, **Docket No. 43–3,** ("POSMF") at ¶ 2. From January 24, 2000, to February 13, 2004, plaintiff worked in Ericsson's Finance Department. Plaintiff's Separate Statement of Uncontroverted Material Facts, **Docket No. 43–3,** ("PSSMF") at ¶ ii; DSUMF at ¶ 3; Defendants' Reply to Plaintiff's Statement of Uncontroverted Facts ("DRSUF") at ¶ ii.

During the summer of 2002, Ericsson began to eliminate certain departments and reduce its personnel. DSUMF at ¶ 7; POSMF at ¶ 7.[2] During this time, Ericsson's personnel in Puerto Rico was reduced from roughly fifty employees to seventeen or eighteen. DSUMF at ¶ 8; DRSUF at ¶ 8; POSMF at ¶ 8.

In November of 2002, the Comptroller, Carmen Silva, resigned, causing plaintiff and López to assume additional responsibilities. DSUMF at ¶ 9; POSMF at ¶ 9. Additionally, both plaintiff and López had to assume additional responsibilities when Ericsson eliminated the Puerto Rico Human Resources Department. POSMF at ¶ 9; DRSUF at ¶ 9. By December of 2002, the Finance Department was composed of Carmen Santiago ("Santiago") (Finance Director), López (Assistant Comptroller) and plaintiff (Assistant Comptroller). DSUMF at ¶ 10; POSMF at ¶ 10; PSSMF at ¶ lxxiii. Santiago resigned in February of 2003. DSUMF at ¶ 12; POSMF at ¶ 12; PSSMF at ¶ lxxiv. López was named Comptroller of Ericsson in April of 2003. DSUMF at ¶ 9; POSMF at ¶ 9. According to plaintiff, López' attitude towards plaintiff changed for the worse beginning around the same time. PSSMF at ¶ v.

On April 13, 2003, Ericsson hired Orquidea Mejía ("Mejia"), through a temporary employment agency, Kelly Temporary Services ("Kelly Services"), to assist in the finance department. DSUMF at ¶ 13; POSMF at ¶ 13. Due to a lack of work, some of plaintiff's functions were transferred to Mejia. PSSMF at ¶¶ lxxxiii, lxxxiv. In April of 2003, when López became Comptroller, plaintiff was required

---

1. Plaintiff, as Assistant Comptroller, performed duties of data entry. PSSMF at ¶ ciii.

2. In 2002, a reorganization took place through which Ericsson became part of the Market Unit of North and Latin America and began to report to Ericsson Venezuela. DSUMF at ¶ 6; POSMF at ¶ 6.

to work longer hours. POSMF at 114; PSSMF at ¶ xxviii. The time she left work depended on the work López requested, which was usually requested after 5:00 p.m.[3] POSMF at ¶ 14; PSSMF at ¶ xxviii. Plaintiff was aware of the fact that Ericsson was going through a "global structuring." DSUMF at ¶ 15; DRSUF at ¶ 15; POSMF at ¶ 15. On May 1, 2003, plaintiff met with López and Helene Ujueta ("Ujueta"), Country Manager of Ericsson, to discuss her work performance and productivity. DSUMF at ¶ 16; POSMF at ¶ 16. At around the same time, April or May of 2003, plaintiff spoke with Ujueta and expressed her concern regarding López' change of attitude towards her. PSSMF at ¶ xxxvi.[4]

## B. Post-injury Employment

On May 20, 2003, plaintiff was diagnosed with congenital hip dysplasia. DSUMF at ¶ 17; POSMF at ¶ 17. Congenital hip dysplasia is a condition of abnormal development of the hip, resulting in hip joint instability and potential dislocation of the thigh bone from the socket in the pelvis. DSUMF at ¶ 18; POSMF at ¶ 18. On May 20, 2003, plaintiff contacted and informed López about her condition. DSUMF at ¶ 19; DRSUF at ¶ 19; POSMF at ¶ 19. On June 13, 2003, plaintiff received a written warning for violating Ericsson's internal procedures regarding absences and because she had failed to meet certain deadlines.[5] DSUMF at ¶ 20; POSMF at ¶ 20. On June 25, 2003, plaintiff sent a letter to Carlson in response to the warning she had received. DSUMF at ¶ 21; POSMF at ¶ 21.[6] In said letter, plaintiff expressed, amongst other things, concern with the way she was being treated by López. **Docket No. 28–11.**

Around the same time—June of 2003—plaintiff complained to López and Colston that the cold temperature in her workspace was affecting her health. PSSMF at ¶ xxxv.[7] Because it was so cold, plaintiff asked López if she could work from home in the afternoons, so that she would not fall behind in her job. *Id.* at xli. López told plaintiff that she had to work the full eight hours at the office. *Id.* at ¶ xli. From June of 2003 onwards, plaintiff informed López of the excruciating pain that the cold temperatures in the office were causing her, and requested that López relocate her. *Id.* at ¶ xliii. Despite her pleas, López refused to relocate plaintiff because she claimed that the requested workstation was too far from her office, despite the fact that it was only thirty-five steps away. *Id.* at ¶¶ xliv, cxi, cxii; DRSUF at ¶ cxii. Because of the cold temperatures, plaintiff was forced to work with a heating pad, a blanket and two

3. At least some of this additional work was due to a recent change in Ericsson's computer system. DSUMF at ¶ 14; PSSMF at ¶ xxvii.

4. After said conversation, López' treatment of plaintiff allegedly became worse. According to plaintiff, López humiliated and screamed at her in front of other people. PSSMF at ¶ xxxvii. She sometimes threw papers at plaintiff. *Id.* López could not have a conversation with plaintiff without becoming agitated. *Id.*

5. Before receiving the June 13, 2003, letter from López, plaintiff spoke with Ann Carlson

("Carlson"), the Human Resource Manager, regarding the treatment she was receiving from López. According to plaintiff, López negative treatment was only directed towards her. PSSMF at ¶ xl.

6. In June of 2003, Ujueta, López and plaintiff held a meeting in order to discuss the problems that were occurring between López and plaintiff. PSSMF at ¶ xxxix.

7. Plaintiff was not the only employee who was cold in the office, Mejia testified that she always wore a jacket in the office. PSSMF at ¶ cxix.

sweaters. PSSMF at ¶ xlvii. Plaintiff kept a thermometer at her desk, and it usually read sixty-five degrees. *Id.* at ¶ li. Further, in June of 2003, López informed plaintiff that the only person she had to express her complaints to was her. *Id.* at ¶ lxviii. She even instructed that plaintiff should keep in mind who was going to evaluate her. *Id.*

Beginning on August 8, 2003, plaintiff formally requested that Ericsson provide her with reasonable accommodations. *Id.* at ¶ xli. In support of said request, plaintiff sent a handwritten medical certificate from Dr. Hector Pagan to Carlson [8] stating the following:

> To whom it may concern:
>
> The pt. Ana Liz Salgado has left hip dysplasia with early arthritis. Is recommended to avoid prolong sitting or standing, avoiding more than 2 hours of sitting and standing (6 to 8 hours working shifts).

DSUMF at ¶ 23; POSMF at ¶ 23. On August 29, 2003, plaintiff provided the medical certificate to López, at which time she requested that her shifts be reduced to no more than six to eight hours. DSUMF at ¶¶ 26, 27; POSMF at ¶¶ 26, 27.[9]

On September 4, 2003, López sent a letter to plaintiff requesting additional information regarding Dr. Pagan's recommendations and, in particular, what type of arrangement or modification Ericsson should provide to plaintiff's job functions as an accommodation, and the duration of said accommodation. DSUMF at ¶ 28; POSMF at ¶ 28. Dr. Pagan wrote a second medical certificate which stated:

> Dear Mrs. López:

The patient, Ana Liz Salgado, has left hip dysplasia with early arthritis. Is recommended to avoid prolong sitting or standing (no more than 6 hours daily). It is also recommended to relocate the patient to a controlled temperature room, with an appropriate chair. Patient needs physical therapy to improve her condition.

Congenital dysplasia, also known as congenital dislocation, is a very painful condition. This condition can be treated with a Total Hip Replacement. If you have any questions or comments, please call (787) 745–1380.

Sincerely,

Hector D. Pagan Marrero, MD

License 10704

DSUMF at ¶ 30; DRSUF at ¶ 30; POSMF at ¶ 30; Plaintiff's Surreply Statement of Facts, **Docket No. 65–7,** ("PSRSF"), at ¶ 30. Despite the invitation to do so, neither López nor Ericsson called Dr. Pagan. PSSMF at ¶ cxvii.

On September 15, 2003, López sent another letter to plaintiff in response to Dr. Pagan's medical certificate. DSUMF at ¶ 31; POSMF at ¶ 31. In said letter, López stated that the medical certificate was unclear and did not recommend a reduced work schedule. López also questioned the certificate by clarifying that plaintiff's job functions did not require her to sit or stand for more than six consecutive hours; that the temperature was controlled in Ericsson's offices where plaintiff was not exposed to sudden temperature changes; that plaintiff identify the chair she needed since it was not clear what Dr. Pagan meant by "an appropriate chair"; and that she could take time off to attend her thera-

---

**8.** Carlson left Ericsson roughly a week after plaintiff gave her the medical certificate. DSUMF at ¶ 25; POSMF at ¶ 25.

**9.** Dr. Pagan testified that the August 8, 2003, medical certificate did not recommend for Ericsson to work no more than six (6) hours. DSUMF at ¶ 29; POSMF at ¶ 29.

pies. López also requested that plaintiff provide a schedule of her therapies so as to enable preparation of a proper work plan for the finance department. DSUMF at ¶ 31; POSMF at ¶ 31. Plaintiff contacted Ujueta on September 18, 2003, regarding her request for accommodation. DSUMF at ¶ 34; POSMF at ¶ 34.

On September 26, 2003, plaintiff filed a discrimination charge with the Puerto Rico Anti–Discrimination Unit ("ADU") and the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on her disability. DSUMF at ¶ 35; POSMF at ¶ 35. On October 2, 2003, López sent another letter to plaintiff requesting additional information from her doctor to evaluate and provide an appropriate accommodation. DSUMF at ¶ 36; POSMF at ¶ 36.

Due to a variety of medical problems, including recovering from psychiatric treatment, plaintiff only worked one day between October 9, 2003, and October 24, 2003. DSUMF at ¶ 37; DRSUF at ¶ 37; POSMF at ¶ 37; PSRSF at ¶ 37.[10] The one day she worked was October 15, 2003.[11] As requested, on October 27, 2003, plaintiff gave another medical certificate to López which stated:

> Esteemed Mrs. López:
>
> The patient, Ana L. Salgado, has dysplasia (hip dislocation). Because of it, the patient needs to work in an area where the temperature is not lower than 70o. It is recommended the patient's work shift be reduced to 6 hours daily and given a tall and wide chair to facilitate her mobility.
>
> If you have any doubts or questions, you may call (787) 745–1380.
>
> Attentively,
>
> Hector P. Pagan–Marrero, M.D.

DSUMF at ¶ 38; DRSUF at ¶ 38; POSMF at ¶ 38. Based upon this certificate, the following actions were taken: the building administrator closed the air conditioner ducts in plaintiff's work area;[12] plaintiff's work schedule was reduced to six hours per day (PSSMF at ¶ liii); López informed plaintiff where she had to go to identify the chair that she wanted and that

---

10. On September 17, 2003, plaintiff visited the offices of Dr. Douglas J. Romero to be treated for depression. PSSMF at ¶ vi. In that initial visit, plaintiff expressed the difficulties she was having at work with her supervisor regarding her hip problem. *Id.* at vii. At the end of the session, Dr. Romero diagnosed plaintiff with "Major Depressive Disorder, Moderate Single Episode Without Psychotic Feature." *Id.* at viii. On September 27, 2003, plaintiff visited Dr. Romero's office for the second time, at which time she once again expressed her distress at work. *Id.* at ix. On October 14, 2003, plaintiff again visited Dr. Romero's office and expressed her distress at work because of problems with her supervisor. *Id.* at x. On October 15, 2003, plaintiff called Dr. Romero and expressed suicidal intentions because of work related problems. *Id.* at xi. On October 16, 2003, plaintiff went to Dr. Romero's office in order to discuss the previous night's telephone call. *Id.* at xii. Dr. Romero referred plaintiff to a Partial Hospitalization Program. *Id.* As a consequence of that referral, plaintiff checked herself into the MEPSI Center. *Id.* at xiv. Plaintiff was discharge from MEPSI Center on October 24, 2003. *Id.* at xv. On October 31, 2003, plaintiff visited Dr. Romero's office for treatment where plaintiff expressed that she was feeling better because she had reported her supervisor to the Human Resources Department. *Id.* at xvi. On December 26, 2003, plaintiff returned to Dr. Romero's office and reported that she had on-going difficulties with her supervisor. *Id.* at xvii

11. On that day, López confronted plaintiff regarding her absences and threatened her with reducing from her salary the hours that she had not worked. PSSMF at ¶ lv.

12. After the administration closed the air conditioning duct, plaintiff's workspace warmed slightly. PSSMF at ¶ cxx.

Ericsson would pay for it[13]; and plaintiff, as part of her reduced hours, was given time off in the mornings to attend her therapy sessions. DSUMF at ¶ 39; DRSUF at ¶ 39; POSMF at ¶ 39. After receipt of this letter, plaintiff's work day began at roughly 10:00–10:30 am and ended around 6:00–6:30pm. PSSMF at ¶ liii; DRSUF at ¶ liii.

On October 30, 2003, López sent plaintiff a letter regarding her discrimination charge. DSUMF at ¶ 40; DRSUF at ¶ 40; POSMF at ¶ 40. In said letter, plaintiff was informed that no adverse employment action would be taken against her because of the filing of her complaint and that plaintiff should submit monthly reports from her physician concerning her condition and any changes in the working restrictions recommended. *Id.* During November of 2003, Ericsson hired a second temporary employee, Juan Carlos Vázquez ("Vázquez"), through Kelly Services, to help out in the finance department. DSUMF at ¶ 41; POSMF at ¶ 41. The work that plaintiff was prohibited by López from doing since August of 2003—*e.g.,* accounts payable, coordinating medical plans and benefits, car and apartment rentals, inter-company invoices—was given to Vazquez. PSSMF at ¶ lix.

Notwithstanding plaintiff's physical limitations, in December of 2003, López requested that plaintiff photocopy numerous documents. PSSMF at ¶ lvi. When plaintiff requested help, López began screaming at her that she had to photocopy the documents herself—no help was to be provided to her. *Id.* On January 7, 2004, plaintiff amended her discrimination charge with the EEOC to include new allegations regarding her disability. DSUMF at ¶ 42; DRSUF at ¶ 42; POSMF at ¶ 42. According to plaintiff, López never offered to work with her regarding her accommodation. PSSMF at ¶ lx. She simply kept pushing the subject further away and required that plaintiff provide more evidence, (*i.e.,* additional medical certificates). *Id.* Since the time plaintiff was diagnosed with her disability, López told her that she was a financial burden for Ericsson. *Id.* at ¶ lxi.

### C. Termination

Plaintiff's employment was terminated on February 13, 2004, without prior notice. *Id.* at ¶ lxiii.[14] When terminated, she asked if she could take the place of Vázquez or Mejía, but López refused to consider it. *Id.* Plaintiff was provided with a "Release and Severance Agreement", which she rejected. DSUMF at ¶ 45; DRSUF at ¶ 45; POSMF at ¶ 45.[15] Ericsson alleges that plaintiff's employment was terminated because her position was being eliminated in accordance with the on-going worldwide reorganization of Ericsson's operations. DSUMF at ¶ 44. Plaintiff, on the other hand, contends that she was terminated because of her disability, the filing of her discrimination charge, and her gender, race and national origin. POSMF at ¶ 44. On February 24, 2004, plaintiff filed another discrimination charge with

---

**13.** The ergonomic chair that plaintiff chose was ordered and paid for on November 12, 2003, and was given to her at the beginning of January of 2004 because the store ("The Better Back Store") did not have it available when plaintiff selected it. DSUMF at ¶ 39.

**14.** During 2002, when other positions at Ericsson were eliminated, the terminated individuals were warned three months in advance. PSSMF at ¶ lxiv. Further, during the years 2001 and 2002, when at least forty persons were terminated, none of them were escorted outside of the company premises, as was plaintiff. *Id.* at ¶ lxv.

**15.** Plaintiff's salary at the time of her employment termination was $32,000.00. *See* DSUMF at ¶ 46; POSMF at ¶ 46.

the EEOC to include new allegations about discrimination based on her disability, race, national origin and retaliation. DSUMF at ¶ 47; POSMF at ¶ 47.

## D. Reorganization

During the fourth quarter of 2002, a company directive called for the worldwide outsourcing of several services that were previously provided by Ericsson. DSUMF at ¶ 69; DRSUF at ¶ 69; POSMF at ¶ 69. The directive called for, among other things, the elimination of some or all of the positions considered "headcount" (or employees directly hired by Ericsson instead of those hired through temporary service and employment agencies) in the various finance departments of Ericsson's regional offices except for the Comptroller position. DSUMF at ¶ 73; DRSUF at ¶ 73; POSMF at ¶ 73. During the year 2003, Gloria Rodriguez ("Rodriguez"), who was the Regional Comptroller for Ericsson's MUNLA stationed in Colombia, requested additional time to implement this directive in said region, which included Puerto Rico. DSUMF at ¶ 75; POSMF at ¶ 75. During the fourth quarter of 2003, Rodriguez alleges that she was instructed by Nicolas Bill, Ericsson's Corporate Comptroller, to implement the company directive reducing the headcount to only the Comptroller position for the finance departments of her region. DSUMF at ¶ 75.[16] During the same time, two temporary employees were hired to help out in the finance department. POSMF at ¶ 76.[17]

Ericsson contends that during the first week of February 2004, it was determined that the Assistant Comptroller position occupied by plaintiff had to be eliminated. DSUMF at ¶ 79; POSMF at ¶ 79. Defendant contends that this decision was made pursuant to the company directive. DSUMF at ¶ 79. At the present time, the only person working in the finance department of Ericsson Puerto Rico is the Comptroller, López.[18]

## E. Stock Purchase Plan

Plaintiff alleges that Ericsson refused to provide information regarding her stock ownership, or to either match or liquidate her stocks. DSUMF at ¶ 54; POSMF at ¶ 54. Ericsson is the sponsor of a "Stock Purchase Plan" that it provides to its employees. DSUMF at ¶ 55. The broker of Ericsson's "Stock Purchase Plan" is Salomon Smith Barney. DSUMF at ¶ 56; POSMF at ¶ 56. In accordance with Ericsson's "Stock Purchase Plan," a terminated employee receives a matching contribution of the balance the employee has at the date of termination. DSUMF at ¶ 57; POSMF at ¶ 57. According to plain-

---

16. During the fourth quarter of 2003, López, on Rodríguez' orders, searched for companies who could provide the outsourced financial services Ericsson required. DSUMF at ¶ 77. During the first quarter of 2004, Ericsson requested proposals regarding the outsourcing of the services that were previously provided by the finance department of Ericsson Puerto Rico. *Id.* at ¶ 78.

17. Despite the directive, and the cost cutting measures, Mejía received a compensation of $25,000.00 from Kelly Services. PSSMF at ¶ xcvi; DRSUF at ¶ xcvi. Ericsson paid Kelly Services 42% more of Mejías salary, adding up to a total of approximately $35,000.00.

PSSMF at xcvii; DRSUF at ¶ xcvii. The data entry duties, and the administration of the medical plan—duties that plaintiff previously performed—were assigned to Mejia. PSSMF at ¶¶ civ, cix; DRSUF at ¶¶ civ, cix. Likewise, Vázquez' starting salary at Kelly Services was $26,000.00 divided in 2,080 hours. PSSMF at ¶ cvi; DRSUF at ¶¶ cvi. Ericsson paid Kelly Services an additional 42% over the $26,000.00. PSSMF at ¶ cvi; DRSUF at ¶¶ cvi.

18. At the time of Rodríguez' Deposition, on September 9, 2005, Mejía was still working at Ericsson. PSSMF at ¶ lxxi

tiff's Stock Purchase Plan Statement, her stock options were matched pursuant to the plan when her employment was terminated by Ericsson. DSUMF at ¶ 58; POSMF at ¶ 58. Plaintiff never contacted Ericsson regarding her stock options after her employment was terminated. DSUMF at ¶ 60; POSMF at ¶ 60.

Plaintiff contends that she did not receive a report of her benefits as a participant of Ericsson's 401K plan. DSUMF at ¶ 61; POSMF at ¶ 61.[19] Plaintiff received the 401K plan statements for the first quarter of 2004 during the discovery in this action. POSMF at ¶ 65. According to Ericsson, it did not receive any other 401K statements until October of 2005. DSUMF at ¶ 66. During the discovery process in the present case, plaintiff was provided with the 401K statements received in October of 2005, with the termination of benefits forms which she had filled and requested. DSUMF at ¶ 67; POSMF at ¶ 67. Plaintiff never contacted Ericsson regarding her 401K statements after her employment termination. DSUMF at ¶ 68; POSMF at ¶ 68.

### F. Racial Discrimination

Plaintiff is a black female and López is a Caucasian female. PSSMF at ¶¶ iii, iv. None of the employees that were brought to work for Ericsson after plaintiff was hired were black. Id. at ¶ lxvi. On February 13, 2004, the date plaintiff was terminated, there were no black employees at Ericsson. Id. at cx.

### II. Standard of Review for Objections to a Report and Recommendation

■ A District Court may refer pending motions to a magistrate-judge for a report and recommendation. See 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b); L. Cv. R. 72(a). Any party adversely affected by the recommendation issued may file written objections within ten days of being served with the report and recommendation. See 28 U.S.C. § 636(b)(1). A party that files a timely objection is entitled to a de novo determination of "those portions of the report or specified proposed findings or recommendations to which specific objection is made." Sylva v. Culebra Dive Shop, 389 F.Supp.2d 189, 191–92 (D.P.R.2005) (citing United States v. Raddatz, 447 U.S. 667, 673, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)). Failure to comply with this rule may preclude further review by the district court and the court of appeals. See Santiago v. Canon U.S.A. Inc., 138 F.3d 1, 4 (1st Cir.1998); Davet v. Maccarone, 973 F.2d 22, 30–31 (1st Cir. 1992). Similarly, a party objecting to a report and recommendation is "not entitled to a de novo review of an argument never raised" before the magistrate-judge. Borden v. Sec. of Health and Human Svcs., 836 F.2d 4, 6 (1st Cir.1987).

■ In conducting its review, the Court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate-judge." 28 U.S.C. § 636(a)(b)(1); see also Templeman v. Chris Craft Corp., 770 F.2d 245, 247 (1st Cir.1985); Alamo Rodríguez v. Pfizer Pharm., Inc., 286 F.Supp.2d 144, 146 (D.P.R.2003). Hence, the Court may accept those parts of the report and recommendation to which the plaintiff does not object. See Hernández–Mejías v. General Elec., 428 F.Supp.2d 4, 6 (D.P.R. 2005) (citing Lacedra v. Donald W. Wyatt

---

19. Ericsson is the plan sponsor and administrator of a "Retirement (401k) Plan" that it provides to its employees. DSUMF at ¶ 62; POSMF at ¶ 62. The plan fiduciary of Erics-

son's 401K Plan is Caribbean Pensions. DSUMF at ¶ 63; POSMF at ¶ 63. Caribbean Pensions was informed of plaintiff's termination. DSUMF at ¶ 64; POSMF at ¶ 64.

*Detention Facility*, 334 F.Supp.2d 114, 125–26 (D.R.I.2004)).

## III. Summary Judgment Standard

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Seaboard Sur. Co. v. Greenfield Middle Sch. Bldg. Comm.*, 370 F.3d 215, 218 (1st Cir.2004). When ruling on a motion for summary judgment, the court "must scrutinize the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences." *Cox v. Hainey*, 391 F.3d 25, 27 (1st Cir.2004). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir.2000) (*quoting Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)). In addition, the "absence of evidence on a critical issue weighs against the party—be it either the movant or nonmovant-who would bear the burden of proof on that issue at trial." *Alamo Rodríguez v. Pfizer Pharma.*, 286 F.Supp.2d 144, 151 (D.P.R.2003) (*citing Perez v. Volvo Car Corp.*, 247 F.3d 303, 310 (1st Cir.2001)). An issue is "genuine" for purposes of summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a "material fact" is one which "might affect the outcome of the suit under the governing law." *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 90 (1st Cir. 1993) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The nonmovant bears "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." *Mulvihill v. Top–Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir.2003). Those facts, typically set forth in affidavits, depositions, and the like, must have evidentiary value. As a rule, "[e]vidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." *Vázquez v. López–Rosario*, 134 F.3d 28, 33 (1st Cir.1998). Finally, it is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## IV. Plaintiff's Objections to the Magistrate–Judge's R & R

In the R & R, the Magistrate–Judge recommends that this Court grant defendants' motion for summary judgment, thereby dismissing the majority of plaintiff's federal claims. In reaching said recommendations, the Magistrate–Judge determined that plaintiff had failed to put forth evidence to support her federal claims. Consequently, the Magistrate–Judge further recommended that the Court decline to exercise pendent jurisdiction over plaintiff's Commonwealth of Puerto Rico claims ("Commonwealth claims"). Plaintiff, for her part, objects to the Magistrate–Judge's factual findings and recommendations on forty-eight separate grounds. **Docket No. 81.**[20] In response, defendants aver that the Magistrate–Judge's recommendations are fully

**20.** For the sake of clarity and organization, the Court will group and address plaintiff's objections as follows: challenges to the Magistrate–Judge's recommendation as they pertain to (1) "factual" determinations; (2) individual liability under Title VII; (3) disability discrimination; (4) failure to accommodate under the ADA; (5) hostile work environment claims; (6) gender, race, and national origin discrimination; (7) stock purchase plan participation and 401K plan claims; and (8) pendent claims.

supported by the record and should stand. **Docket No. 84.** The Court will address plaintiff's objections to each recommendation in turn.

### 1. "Factual" Determinations

Plaintiff's first set of objections relate to the Magistrate–Judge's recitation of contested and uncontested facts. More specifically, plaintiff argues that some of the Magistrate–Judge's "factual statements" are incomplete and directly controverted by plaintiff's evidence. Neither objection warrants a reversal and/or modification of the R & R.

First, while plaintiff's objections regarding additional or missing language in the Magistrate–Judge's recitation of both Defendants' Contested/Uncontested Facts and Plaintiff's Contested and Uncontested Statements may be correct (**Docket No. 81, at 2, ¶ 1; 17–22, ¶¶ 6–9**), they are extremely minor, mostly irrelevant and have no bearing on the ultimate outcome of the case. Accordingly, the Court finds no reason to alter, modify or reject the recommendations reached by the Magistrate–Judge based upon these objections.

Second, the remainder of plaintiff's objections to the Magistrate–Judge's recitation of defendants' factual averments and discussion of the same (**Docket No. 81, at 2–17, ¶¶ 2–5, 10**) are misguided, and warrant little more than a brief discussion. Plaintiff makes a number of objections to "statements" or "factual findings" allegedly made by the Magistrate–Judge during her recitation of defendants' facts. Mainly, plaintiff calls into question certain of the Magistrate–Judge's "statements" be-

cause, as plaintiff argues, they are factually incorrect. From these "statements," plaintiff feels that the Magistrate–Judge has failed to view the facts in a light most favorable to it, the nonmoving party. The problem with the objections to these "statements" or "findings" is that—once you read and examine the R & R—they are nothing more than the Magistrate–Judge's recitation over—pages of defendants' averments and beliefs, not the Magistrate–Judge's factual or legal findings. Accordingly, the Court sees no reason to alter, modify, or reject the R & R based upon the Magistrate–Judge's correct restatement of defendants' positions and beliefs.

### 2. Individual Liability Under Title VII

Plaintiff's next objection concerns the alleged misplacement of a footnote in the section of the R & R wherein the Magistrate–Judge recommends that plaintiff's Title VII discrimination and hostile work environment claims against López, in her individual capacity, be dismissed. **Docket No. 74, at 59 n. 6.** This objection has no bearing on the recommendation put forth by the Magistrate–Judge. As such, even if plaintiff is correct by pointing to the footnote's inconsequential effect, it remains a fact that plaintiff has failed to object to the Magistrate–Judges' recommendation for dismissal of the Title VII claims brought against López. (*See Meijas Miranda v. BBII Acquis'n Corp.,* 120 F.Supp.2d 157 (D.P.R.2000) (holding that no individual liability exists under Title VII)) [21]. Therefore, the Court adopts the

---

**21.** Likewise, there is no individual liability under the ADA. *See Wright v. CompUSA, Inc., et al.,* 183 F.Supp.2d 308, 310 (D.Mass.2001) (explaining that claim against supervisor must be dismissed on ground that ADA precludes individual liability); *Vizcarrondo v. Board of Trustees of Univ. of Puerto Rico,* 139 F.Supp.2d 198, 201 (D.P.R.2001) (holding that the ADA, ADEA and Title VII do not permit individual liability); *Ali v. Univ. of Massachusetts Medical Center,* 140 F.Supp.2d

Magistrate–Judge's recommendation (**Docket No. 74,** at 59), thereby granting defendants' motion for summary judgment as to this claim.

### 3. Disability Discrimination

Plaintiff's next set of objections concerns the Magistrate–Judge's recommendation that this Court dismiss plaintiff's disability discrimination claim inasmuch as plaintiff failed to make out a *prima facie* case and could not show that Ericsson's stated reason for terminating her was a pretext for discriminatory animus. Specifically, plaintiff argues that she has made out a *prima facie* case of disability discrimination, and that her evidence clearly establishes that Ericsson's stated reason for terminating her was a pretext.[22]

 In order to establish a claim under the ADA, in the absence of direct evidence of discrimination, a plaintiff must rely on circumstantial evidence and establish a *prima facie* case through the burden shifting method developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 264 (1st Cir.1999). If the plaintiff succeeds in establishing a *prima facie* case,[23] the presumption arises that the employer unlawfully discriminated

against plaintiff, and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory basis for its adverse employment action. *Laurin v. Providence Hosp.,* 150 F.3d 52, 58 (1st Cir.1998); *Champagne v. Servistar Corp.,* 138 F.3d 7, 12 (1st Cir.1998). The defendants' burden at this stage is only a burden of production; the ultimate burden of proof remains always with the plaintiff. *See Dominguez–Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424 (1st Cir.2000). If the defendant is able to meet its burden, "the plaintiff no longer can rest on the initial inference of discrimination but, rather, must show that the defendant's articulated reason is pretextual." *Bennett v. Saint–Gobain Corp.,* 507 F.3d 23, 31 (1st Cir. 2007) (*citing Dávila v. Corporacion de Puerto Rico Para La Difusion Publica,* 498 F.3d 9, 16 (1st Cir.2007)). The plaintiff then has the burden of establishing both that the defendant's proffered reason is merely a pretext and that the real reason is a discriminatory animus. *Dichner v. Liberty Travel,* 141 F.3d 24, 30 (1st Cir.1998). Aware that the majority of plaintiff's objections concern the pretextual nature of Ericsson's nondiscriminatory reason for terminating her, the Court assumes, for purposes of this Opinion, that plaintiff made out a *prima facie* case of discrimination[24] and that Ericsson put

107, 109 (D.Mass.2001) (same with respect to ADA).

**22.** These two general themes—that plaintiff made out a *prima facie* case and that Ericsson's argument as to why plaintiff was terminated are a pretext—are contained in thirteen separate "objections" over twelve pages. **Docket No. 81,** at 24–35.

**23.** To establish a *prima facie* case under the ADA, plaintiff must prove by a preponderance of the evidence: (1) that she is disabled within the meaning of the ADA; (2) that she is able to perform the essential functions of her job, with or without reasonable accommodation;

and (3) that the adverse employment decision was based in whole or in part on her disability. *See Phelps v. Optima Health Inc.,* 251 F.3d 21, 24 (1st Cir.2001); *Marcano–Rivera v. Pueblo Int'l.,* 232 F.3d 245, 251 (1st Cir.2000).

**24.** As made clear by the First Circuit Court of Appeals, establishing a *prima facie* case under *McDonnell Douglas* is not onerous. *See Douglas v. J.C. Penney Co., Inc.,* 474 F.3d 10, 14 (1st Cir.2007); *Che v. Massachusetts Bay Transp. Auth.,* 342 F.3d 31, 38 (1st Cir.2003); *Cruz–Ramos v. Puerto Rico Sun Oil Co.,* 202 F.3d 381, 384 (1st Cir.2000); *Williams v. Raytheon Co.,* 220 F.3d 16, 19 (1st Cir.2000).

forth a legitimate, nondiscriminatory basis for terminating plaintiff.

After reviewing the record in its entirety, the R & R, and plaintiff's objections and defendants' opposition to the same, the Court cannot agree with plaintiff and her belief that the evidence, taken as a whole and in a light most favorable to her, establishes that Ericsson's stated reason for terminating her was pretextual. While plaintiff directs this Court's attention to events which she believes supports her contention—the fifteen month delay between the time of the corporate mandate to downsize and her ultimate termination, the fact she was escorted out of the building following her termination while other employees were not, receipt of a severance package, the cost of employing temporary employees as compared to her salary, and López statement that she was a financial burden on Ericsson—she points to no evidence, outside of her subjective belief, that the real reason she was terminated was because of discriminatory animus. The Magistrate–Jude correctly concluded that plaintiff upon termination was not substituted by another regular employee, some of the duties performed by plaintiff continued to be performed by out source personnel as it had been done while plaintiff received reasonable accommodation and reduction of her work shift and her position was no longer authorized as part of the company's downsizing.

"To survive a defendant's motion for summary judgment on a discrimination claim, a plaintiff must produce sufficient evidence to create a genuine issue of fact as to two points: 1) the employer's articulated reasons for its adverse actions were pretextual, and 2) the real reason for the employer's actions was discriminatory animus based on a protected category." *Mariani–Colón*, 511 F.3d at 223. Here, even if plaintiff had been able to show that

Ericsson's stated reason for terminating her was pretextual—which she has not done—she has wholly failed to show that the real reason for her termination was discriminatory animus.

Accordingly, the Court agrees with the conclusion reached by the Magistrate–Judge, thereby granting defendants' motion for summary judgment as it pertains to plaintiff's disability discrimination claim.

### 4. Failure to Accommodate Under ADA

Plaintiff next claims that the Magistrate–Judge erred in recommending that her failure to accommodate claim under the ADA be dismissed. Specifically, plaintiff contends that she has put forth enough evidence to raise a genuine issue of material fact as to whether Ericsson either failed to accommodate her disability or failed to participate in the interactive process in good faith. Ericsson, for its part, contends that the Magistrate–Judge's recommendation was correct inasmuch as it took part, in good faith, in the interactive process with plaintiff and provided her with all of her requested accommodations. While a close question, the Court agrees with plaintiff, thereby rejecting the recommendation of the Magistrate–Judge.

An employer may violate the ADA if it knows of an employees disability, yet fails to make reasonable accommodations for said employee. *Estades Negroni v. Associates Corp. Of North America*, 377 F.3d 58, 63 (1st Cir.2004). To survive summary judgment on her reasonable accommodation claim, plaintiff must produce enough evidence for a reasonable jury to find that: (1) she is disabled within the meaning of the ADA; (2) she was able to perform the essential functions of the job with or without a reasonable accommodation; and (3) that defendants, despite knowing of her disability, did not reason-

ably accommodate it. *See Rocafort v. IBM Corp.*, 334 F.3d 115, 119 (1st Cir. 2003). It is undisputed that plaintiff meets the first two prongs of her reasonable accommodation claim. First, Ericsson concedes, for summary judgment purposes, that plaintiff has a disability under the ADA. **Docket No. 28–2,** at 8. Second, it is clear from the record, and Ericsson do not contend otherwise, that plaintiff would have been able to perform the essential functions of her job with reasonable accommodations. Therefore, the Court will focus its attention on the third prong: whether Ericsson knew of plaintiff's disability yet failed to accommodate it.

 The ADA imposes liability for an employer's failure to accommodate an employee's "known physical or mental limitations." 42 U.S.C. § 12112(b)(5)(A). Ordinarily, the employer's duty to accommodate is triggered by a request from the employee. *Freadman v. Metropolitan Property and Cas. Ins. Co.*, 484 F.3d 91, 102–03 (1st Cir.2007) (*citing Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir.2001)). That is because "an employee's disability and concomitant need for accommodation are often not known to the employer." *Reed,* 244 F.3d at 261. Hence, the plaintiff has the burden of showing that she "sufficiently requested the accommodation in question." *Id.* at 260. The employee's request must be "sufficiently direct and specific," giving notice that she needs a "special accommodation." *Wynne v. Tufts Univ.*, 976 F.2d 791, 795 (1st Cir.1992) (*quoting Nathanson v. Medical Coll. of Pa.*, 926 F.2d 1368, 1381 (3d Cir.1991)). At the least, the request must explain how the accommodation requested is linked to some disability. "The employer has no duty to divine the need

for a special accommodation where the employee merely makes a mundane request for a change at the workplace." *Reed,* 244 F.3d at 261.

 In addition to making the required request for accommodation, plaintiff must also establish that the requested accommodation is reasonable, "would enable her to perform the essential functions of her job," and that the request is feasible for the employer under the circumstances. *Id.; see also U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 401–02, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002); *Mulloy v. Acushnet Co.*, 460 F.3d 141, 148 (1st Cir.2006). Once made, Ericsson has the opportunity to show that the proposed accommodation would impose an undue hardship. *Reed,* 244 F.3d at 259; *Barnett,* 535 U.S. at 402, 122 S.Ct. 1516.

 Here, it is undisputed that Ericsson was notified of plaintiff's medical condition on May 20, 2003. DRSUF at ¶ 19; POSMF at ¶ 19. Once informed of plaintiff's condition, López looked it up on the internet and testified that she understood it to be "a degeneration of the bone" and that it was painful. **Docket No. 65,** Ex. 1, pg. 116. The following month, June of 2003, plaintiff informed her superiors that the cold temperatures in the office was causing her pain and requested that they relocate her from her cubicle to another work station, roughly thirty-five (35) steps from Lopez' office.[25] *See Freadman,* 484 F.3d at 102–03 (explaining that in order for a request to comply with the ADA requirements, it "(1) must be sufficiently direct and specific, and (2) must explain how the accommodation requested is linked to some disability") (internal quotation and citations omitted). Notwithstand-

---

**25.** *See* **Docket No. 65,** Ex. 1, pg. 142 (López testified that plaintiff "sent emails in June saying that … because of the cold, she had to go to her house to rest because she was in a lot of pain."); *see also* PSSMF at xxxv.

ing the knowledge that plaintiff had a serious hip condition and that plaintiff had specifically informed her superior that her hip condition was aggravated by the cold temperature in the office, neither López nor Ericsson took any steps to accommodate plaintiff, instead they refused her relocation request by claiming that the requested location was too far from Lopez' office and the finance area. In this regard, López testified that she did not relocate plaintiff because plaintiff had not yet provided her with a "specific medical order stating that the temperature situation was occurring." **Docket No. 49–8**, at 143, lns. 10–13; 148, lns. 1–8. However, defendants have made no attempt to argue that the proposed accommodation would impose an undue hardship.

On August 8, 2003, Dr. Pagan, on behalf of plaintiff, wrote a medical certificate ("August Certificate") recommending that, due to plaintiff's medical condition, she should "avoid prolong[ed] sitting or standing, avoiding more than 2 hours of sitting and standing (6 to 8 hours working shifts)." Upon presentation of the August Certificate, plaintiff requested that her work shift be reduced to six hours a day—said request was denied.[26] In response, López sent plaintiff a letter requesting additional information regarding Dr. Pagan's recommendations. In particular, López wanted to know what type of arrangement or modification Ericsson should provide to plaintiff's job functions as an accommodation and the duration of said accommodation. As such, on September 9, 2003, plaintiff submitted a second medical certificate from Dr. Pagan ("September Certificate") which stated, amongst other things, that plaintiff should "avoid prolong[ed] sitting or standing (no more than 6 hours daily)" and that defendants should

". . . relocate [plaintiff] to a controlled temperature room, with an appropriate chair." In closing, Dr. Pagan stated that "[i]f you have any questions or comments, please" call me. Neither Ericsson, nor López ever contacted Dr. Pagan. Instead, in response to the September Certificate, López sent plaintiff another letter, which stated: (1) the September Certificate did not recommend a reduced work schedule; (2) that her job did not require her to sit or stand for more than six hours; (3) that the temperature was controlled (by means of central air-conditioning system) Ericsson's offices, and that she was not exposed to sudden temperature changes; (4) that plaintiff identify the chair she needed since it was unclear what Dr. Pagan meant by "appropriate chair"; and (5) that plaintiff could take time off to attend her therapies. After plaintiff reached out to Ujueta regarding her accommodation request on September 22, 2003, and filed a discrimination charge with the ADU and the EEOC on September 26, 2003, López sent plaintiff yet another letter. In this letter, dated October 2, 2003, López reiterated what she had already stated in her previous letter, and, again, requested additional information from Dr. Pagan to evaluate and provide an appropriate description of the accommodation being recommended for plaintiff.

In response to this request, plaintiff submitted a third letter from Dr. Pagan on October 27, 2003 ("October Certificate"), which stated, *inter alia*, that plaintiff "needs to work in an area where the temperature is not lower than 70 [degrees]", and that her "work shift be reduced to 6 hours daily and [that she be] given a tall and wide chair to facilitate her mobility." In response to the October Certificate, Ericsson had the building administrator

---

**26.** Dr. Pagan stated in his deposition that the August Certificate did not recommend that plaintiff should only work six hours at a time. **Docket No. 33**, at Ex. 10, pg. 16, lns. 14–22.

close the air conditioner duct over plaintiff's workspace reduced the length of plaintiff's work day, instructed plaintiff to identify and order the chair she wanted,[27] and gave plaintiff time off in the morning to attend therapy sessions. In sum, according to Ericsson, the Puerto Rico offices do not have independent room or floor regulators to control temperature. Nonetheless, it is clear from López deposition testimony, that defendants knew that cold temperature aggravated plaintiff's condition, had access to air-duct over plaintiff's workspace at all times, yet failed to close it until the end of October.

Based on the above, while it is a very close question, it is evident to the Court that there is sufficient evidence to create a triable issue as to whether Ericsson took part in the necessary interactive process with plaintiff in good faith. While Ericsson contends that it did everything within it's power to reasonably accommodate plaintiff, reviewing the evidence in a light most favorable to the plaintiff, a reasonable jury could conclude otherwise. Accordingly, since genuine issues of material fact remain, the Court declines to adopt the recommendation of the Magistrate–Judge, and defendants' motion for summary judgment as to plaintiff's reasonable accommodation claim is denied.

### 5. Hostile Work Environment Claims

Next, plaintiff objects to the Magistrate–Judge's recommendation that her hostile work environment claim be dismissed. In sum, plaintiff contends that the evidence

shows that she was discriminated against by López "for being a black qualified woman" and because of her disability. Defendants aver that the Magistrate–Judge's recommendation was correct. After reviewing the record, the Court agrees with the recommendation of the Magistrate–Judge.[28]

■ In order to succeed in her hostile work environment claim, plaintiff must show: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment based upon her protected status; (3) that the harassment was based upon her gender, race, national origin, or disability; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that the objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive, and the victim did perceive it to be so; and (6) that some basis for employer liability has been established. *Douglas v. J.C. Penney*, 474 F.3d 10, 15 (1st Cir.2007) (*quoting O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir.2001)); *Rodríguez Velázquez v. A.M.A.*, 502 F.Supp.2d 200, 209 (D.P.R.2007) (explaining that "[i]t has been held that, similar to Title VII discrimination actions, ADA-covered individuals may assert hostile work environment claims premised on disability-based harassment") (*citing Quiles–Quiles v. Henderson*, 439 F.3d 1, 5 n. 1 (1st Cir.2006)).

---

**27.** Ericsson purchased the chair chosen by plaintiff on November 12, 2003, but, because it was not in stock when ordered, it was not delivered until January of 2004.

**28.** After reviewing the complaint, it is questionable whether plaintiff has even plead a hostile work environment claim. This appears to explain why defendants have not specifically moved for summary judgment with regards to this claim. Nonetheless, inasmuch as the Magistrate–Judge addressed it, and plaintiff has objected to the R & R's factual determinations and recommendations, the Court will address the issue.

■ To establish a hostile work environment claim, a plaintiff must show that her "workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive so as to alter the conditions of . . . [her] employment and create an abusive working environment." *Quiles–Quiles*, 439 F.3d at 7 (*citing Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). More specifically, "mere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 20, 114 S.Ct. 367. "Although there is no mathematically precise test, in order to determine whether an environment is hostile or abusive, the Court must look at all the circumstances, which may include: (1) the frequency of the discriminatory conduct, (2) its severity, (3) whether it is physically threatening or humiliating, (4) whether it was just a mere utterance, and (5) whether it unreasonably interferes with an employee's work performance." *Rodriguez–Robles v. Pfizer Pharm., LLC*, 561 F.Supp.2d 180, 184–85 (D.P.R.2008) (*citing Harris*, 510 U.S. at 23, 114 S.Ct. 367). Although the inquiry into a plaintiff's claim is necessarily fact-specific, and, therefore, generally left to the factfinder, "summary judgment is an appropriate vehicle for policing the baseline for hostile environment claims." *Pomales v. Celulares Telefónica, Inc.*, 447 F.3d 79, 83 (1st Cir.2006).

■ Here, as found by the Magistrate–Judge, the record does not provide a sufficient basis from which a reasonable factfinder could conclude that plaintiff was subjected to a hostile work environment. As far as the Court can gather—as plaintiff has failed to develop this argument in her complaint, motion papers in opposition to the summary judgment motion or in her objections to the R & R—plaintiff's hostile work environment claim is predicated upon the following allegations: (1) López changed her attitude towards plaintiff after she was promoted to Comptroller; (2) López humiliated and screamed at plaintiff in front of other employees; (3) López screamed at plaintiff for failing to sign a "warning" for violating internal procedures; and (4) Lopez' comment about plaintiff being an economic burden. Based upon these facts, even when taken in the aggregate and in a light most favorable to plaintiff, the complained of conduct is neither severe nor pervasive enough to constitute actionable harassment. Further, plaintiff is unable to put forth any evidence, besides her own conjecture, nor can it be inferred from the record, that Lopez' conduct, even if severe and pervasive, was directed at plaintiff because of her gender, race, national origin, or disability. *See Rivera v. Puerto Rico Aqueduct and Sewers Auth.*, 331 F.3d 183, 189 (1st Cir.2003); *Quiles–Quiles*, 439 F.3d at 7 (explaining that a plaintiff must demonstrate that the hostile conduct was directed at her because of a characteristic protected by a federal anti-discrimination statute). The Magistrate–Judge correctly determined that: (a) López attitude toward plaintiff had change prior to receiving any information on plaintiff's medical condition, (b) plaintiff points to no evidence of pervasiveness, (c) plaintiff was only once alluded to be an economic burden, situation that was not repetitive and at most was just an offence utterance, (d) plaintiff's complaints were made after López had once, by June 13, 2003, already complained of plaintiff's work performance and absences. Accordingly, plaintiff has failed to establish a hostile work environment claim under either Title VII or the ADA.

Based on the foregoing, the Court adopts the recommendation of the Magistrate–Judge, and thereby, to the extent it

is raised, dismisses plaintiff's hostile work environment claim.

### 6. Gender, Race and National Origin Discrimination

Plaintiff next argues that the Magistrate–Judge erred in concluding that plaintiff's discrimination claims based upon gender, race and national origin should be dismissed. In reaching said recommendation, the Magistrate–Judge concluded, *inter alia*, that plaintiff had failed to make out a *prima facie* case inasmuch as plaintiff failed to establish a causal connection between the employment action and her gender, race or national origin. Additionally, the Magistrate–Judge concluded that plaintiff could not show that other employees not within the protected classes were treated differently. Finally, the Magistrate–Judge concluded that plaintiff had failed to show that Ericsson's stated reason for terminating her—a worldwide reorganization—was a pretext for discriminatory animus. In her objections, plaintiff attempts to show that she made out a *prima facie* case of discrimination. After reviewing plaintiff's objections and the record, the Court agrees with the recommendation of the Magistrate–Judge.

Title VII prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In the summary judgment context, when an employer is charged with discrimination and there is no direct evidence that discriminatory animus motivated the challenged employment action, the plaintiff must prove her case through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Bennett v. Saint-*

*Gobain Corp.*, 507 F.3d 23, 30 (1st Cir. 2007). Here, plaintiff has not put forth any direct evidence of age discrimination, *see, e.g., Vesprini v. Shaw Contract Flooring Servs., Inc.*, 315 F.3d 37, 41 (1st Cir. 2002) ("Although ... somewhat murky, the term 'direct evidence' normally contemplates only those 'statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision.'" (emphasis omitted)), therefore the burden-shifting framework applies. Under *McDonnell Douglas*, it is the plaintiff's burden to establish a *prima facie* case of discrimination. To the extent plaintiff is able to do so, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory basis for its adverse employment action. *See Bennett*, 507 F.3d at 30–31. The defendants' burden at this stage is only a burden of production; the ultimate burden of proof remains always with the plaintiff. *See Dominguez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424 (1st Cir.2000). If the defendant is able to meet its burden, "the plaintiff no longer can rest on the initial inference of discrimination but, rather, must show that the defendant's articulated reason is pretextual." *Bennett*, 507 F.3d at 31 (*citing Dávila*, 498 F.3d at 16). In order to defeat a defendant's summary judgment motion, a plaintiff must produce evidence to show that: "(1) the employer's given reason for the employment decision is a pretext; and (2) the true reason is discriminatory animus." *Rios v. Rumsfeld*, 323 F.Supp.2d 267, 274 (D.P.R.2004) (*citing Feliciano de la Cruz v. El Conquistador Resort and Country Club*, 218 F.3d 1, 6 (1st Cir.2000)). "At this point, 'the presumption of discrimination drops out of the picture, the *McDonnell Douglas* framework with its presumptions and burdens disappears, and the sole remaining issue is of discrimination vel non.'" *Id.* (*quoting Zapata–Matos v. Reckitt & Cole-*

*man, Inc.,* 277 F.3d 40, 45 (1st Cir.2002) (internal citations omitted)); *Mesnick v. Gen. Elec. Co.,* 950 F.2d 816, 827 (1st Cir.1991) (stating that after the employer rebuts the presumption, the courts must "focus on the ultimate question, scrapping the burden-shifting framework in favor of considering the evidence as a whole. Thus, the critical inquiry becomes whether the aggregate evidence of pretext and retaliatory animus suffices to make out a jury question."). In deciding whether or not to grant the summary judgment motion, the Court "must weigh all the circumstantial evidence of discrimination, including the strength of plaintiff's prima facie case and the employer's proffered reasons for its action, mindful that 'everything depends on individual facts.'" *Feliciano de la Cruz,* 218 F.3d at 7 *(quoting Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 57 (1st Cir.1999)).

■ In the instant action, even if the Court assumes, *arguendo,* that plaintiff had made out a *prima facie* case of discrimination, it has failed, as discussed above with regards to plaintiff's disability discrimination claim, to put forth any evidence that creates a genuine issue of material fact as to whether "1) the employer's articulated reasons for its adverse actions were pretextual, and 2) the real reason for the employer's actions was discriminatory animus based on a protected category." *Mariani–Colón,* 511 F.3d at 223. Instead, plaintiff relies wholly on her own beliefs and speculations about defendants "true" reason for terminating her. In fact, the only evidence of gender, racial or national origin discrimination put forth by plaintiff is: (1) that she was the only black female working at Ericsson for the period relevant to the complaint, that López was Caucasian, and that the two other temporary employees were not black; (2) that she was a woman and one of the temporary

employees working at Ericsson was a man; (3) that, as a Puerto Rican, she thought it was wrong and disrespectful that Officers of Ericsson who came to the Puerto Rico office spoke Swedish in front of her; and (4) that as a Puerto Rican national and a black woman, she had not been afforded the same prior notice regarding her termination as other employees were. From this, plaintiff asks the Court to infer that Ericsson's stated reason for terminating her is not only pretextual, but also that she was terminated because she fell into the various protected categories. The Court declines to do so. *See Hoeppner v. Crotched Mountain Rehab. Ctr., Inc.,* 31 F.3d 9, 14 (1st Cir.1994) ("Even in discriminatory discharge cases, where the plaintiff can rarely present direct, subjective evidence of an employer's actual motive, the plaintiff cannot survive summary judgment with 'unsupported allegations and speculations,' but rather must 'point to specific facts detailed in affidavits and depositions—that is, names, dates, incidents, and supporting testimony-giving rise to an inference of discriminatory animus.'") *(quoting Lipsett v. Univ. of Puerto Rico,* 864 F.2d 881, 895 (1st Cir.1988)); *Medina–Muñoz,* 896 F.2d at 8 (explaining that in discrimination cases, summary judgment is appropriate where the nonmoving party rests entirely upon "conclusory allegations, improbable inferences, and unsupported speculation" on any essential element of the discrimination claim).

Based on the foregoing, the Court adopts the recommendation of the Magistrate–Judge, and grants defendants' summary judgment as to plaintiff's Title VII discrimination claims.

### 7. Stock Purchase Plan Participation and 401K Plan Claims

To the extent plaintiff does not specifically object to the Magistrate–Judge's rec-

ommendation that her claims regarding her stock purchase plan and 401K plan be dismissed, and after reviewing the record, the Court adopts the recommendation of the Magistrate–Judge. Accordingly, defendants' motion for summary judgment with regards to these claims are granted.

## 8. Pendent Claims

Plaintiff's next objection concerns the Magistrate–Judge's recommendation that the Court, inasmuch as she recommended dismissal of the majority of plaintiff's federal claims, should decline to exercise jurisdiction over the Commonwealth claims. However, because the Court has declined to dismiss one of plaintiff's federal claims, the Court will exercise supplemental jurisdiction over the Commonwealth claims.

### A. Law 44

■■■ Law 44 is Puerto Rico's counterpart to the ADA. *See Arce v. ARAMARK Corp.*, 239 F.Supp.2d 153, 169 (D.P.R. 2003). Like the ADA, Law 44 prohibits discrimination against individuals with disabilities by any public or private institution that receives funds from the Commonwealth of Puerto Rico. 1 L.P.R.A. § 501 *et seq.* Specifically, Law 44 provides that said institutions may not take any action to "discriminate against persons with some type of physical or mental disability." 1 L.P.R.A. § 504. As such, "[i]n conjunction with the ADA, Law 44 creates an obligation for any employer to provide reasonable accommodations, and prohibits discrimination against persons with disabilities." *Roman Martinez v. Delta Maintenance Service, Inc.*, 229 F.Supp.2d 79, 85 (D.P.R.2002) (*citing Rios Jaimán v. Cidra Mfg. Operations of Puerto Rico, Inc.*, 145 D.P.R. 746, 749 (1998)). Thus, the elements of proof for a claim under Law 44 are essentially the same as those for establishing a claim under the ADA. *See, e.g., Román Martínez v. Delta Maint. Serv., Inc.*, 229 F.Supp.2d 79, 85 (D.P.R.2002); *Zayas v. Commonwealth of Puerto Rico*, 378 F.Supp.2d 13, 23–24 (D.P.R.2005).

Accordingly, to the extent plaintiff's failure to accommodate claim under the ADA survives, plaintiff's failure to accommodate claim under Law 44 likewise survives. However, to the extent plaintiff's disability discrimination claim based upon her termination under the ADA failed, the same claim under Law 44 also fails. As such, defendants' motion for summary judgment as to plaintiff's Law 44 claim is granted in part and denied in part.

### B. Law 80

■■■ Plaintiff also seeks relief under Law 80, Puerto Rico's Wrongful Discharge Act. 29 L.P.R.A. § 185a *et seq.* The purpose of Law 80 is to protect employees by requiring employers to indemnify them if they are discharged without just cause. *Id.* As such, under Law 80, a dismissal without just cause is one "made by mere whim or fancy of the employer or without cause relative to the normal operation of the establishment." *Id.* at § 185b. The statute, however, sets forth a nonexclusive list of reasons that are deemed to constitute "just cause" for dismissal. Amongst others, the list includes:

(a) . . .

(b) . . .

(c) . . .

(d) Full, temporary or partial closing of the operations of the establishment.

(e) Technological or reorganization changes as well as changes of style, design or the nature of the product made or handled by the establishment, and changes in the services rendered to the public.

(f) Reductions in employment made necessary by a reduction in the anticipated or prevailing volume of production, sales or profits at the time of the discharge.

*Id.*

■ Under the statute, the burden falls on the employer to prove that it had just cause for the termination. *Id.* at § 185k; *see also Miranda Vega v. Cingular Wireless,* 568 F.Supp.2d 180, 191–92 (D.P.R.2008). " '[O]nce an employee proves that he was discharged and alleges that his dismissal was unjustified, his employer must establish by a preponderance of the evidence that the discharge was for good cause.' " *Miranda Vega,* 568 F.Supp.2d at 193 (*quoting Hoyos v. Telecorp Commc'ns, Inc.,* 488 F.3d 1, 6 (1st Cir.2007)).

■ Here, after reviewing the record in its entirety, the Court agrees with Ericsson's contention that the decision to terminate plaintiff's employment resulted from legitimate business reasons. As the record shows, Ericsson underwent a worldwide reorganization which resulted in the justified termination of plaintiff's employment.

Based on the foregoing, the Court finds that there was just cause for plaintiff's termination, and, therefore, defendants' motion for summary judgment regarding plaintiff's Law 80 claim is granted.

**C. Law 100 and Law 69**

■ Law 100 is Puerto Rico's general employment discrimination statute. 29 L.P.R.A. § 146. Law 69, which specifically prohibits gender discrimination, represents a more specific prohibition of the type of behavior and conduct that is already prohibited by Law 100. 29 L.P.R.A. § 1323; *see Suárez Ruíz v. Figueroa Colón,* 145 D.P.R. 142, 1998 WL 385156, 1998 JTS 32 (1998).

■ While Law 100 prohibits conduct similar to that of Title VII, the Puerto Rico Supreme Court has recognized that it is more plaintiff-friendly than its federal counterpart. *See Domínguez v. Eli Lilly & Co.,* 958 F.Supp. 721, 744 (D.P.R.1997) ("Law 100 is much more plaintiff-friendly than its federal counterpart. Therefore, it is possibly conceivable that in some controversies the result may ultimately rest on which of the two statutes applies.") (*quoting Ibañez v. Molinos de P.R., Inc.,* 14 P.R. Offic. Trans. 58, 114 D.P.R. 42 (1983)). Law 100 places a tougher burden on defendants than does Title VII. *See Medina v. Adecco,* 561 F.Supp.2d 162 (D.P.R.2008) (*citing Hoyos v. Telecorp. Commc'ns, Inc.,* 405 F.Supp.2d 199, 206–07 (D.P.R.2005), *aff'd,* 488 F.3d 1 (1st Cir. 2007)).

■ More specifically, "[u]nder Law 100, plaintiff bears the initial burden of establishing: (1) that she suffered an adverse employment action; (2) that the adverse employment action was not justified; and (3) some basic fact substantiating the type of discrimination alleged." *Id.* at 190–92 (*citing Hoyos,* 405 F.Supp.2d at 206). If plaintiff is able to establish all three factors, a rebuttable presumption of discrimination arises, and the burden shifts to the employer to prove by a preponderance of the evidence that the adverse employment action was not motivated by discriminatory animus. *See* 29 L.P.R.A. § 148; *Hoyos,* 405 F.Supp.2d at 206; *Mejias Miranda,* 120 F.Supp.2d at 173 (discussing burden shifting analysis under Law 100). "Thus, in order to rebut the Law 100 presumption, the employer must prove, by a preponderance of the evidence, that the challenged action was not motivated by discriminatory animus." *Mejias Miranda,* 120 F.Supp.2d at 173 (internal citation and quotations omitted). If the employer is successful in its attempt

to rebut the presumption, then the employee bears the burden of proving discrimination. *Id.* Law 100's presumption of discrimination is triggered when it is shown that the employer lacked "just cause" to take an adverse employment action against an employee. *Alvarez–Fonseca v. Pepsi Cola of Puerto Rico Bottling Co.*, 152 F.3d 17, 28 (1st Cir.1998). However, because Law 100 does not define the term "just cause," the Supreme Court of the Commonwealth of Puerto Rico has determined that the term's definition would be taken from Law 80.[29] *Id.*

Here, as discussed above, plaintiff has presented no evidence, outside of her own speculation, to support her claim of gender, racial, or national origin discrimination. In fact, plaintiff spends virtually no time whatsoever attempting to flush out her non-disability based discrimination claims; choosing instead to rest on her unsupported beliefs that all actions taken by Ericsson were motivated by discriminatory animus. Notwithstanding, even assuming that plaintiff were able to make out a *prima facie* case of discrimination under Law 100, Ericsson has proved, by a preponderance of the evidence, that discriminatory animus did not motivate plaintiff's termination. Further, as Law 100 requires at the third stage, plaintiff has been unable to prove gender, racial or national origin discrimination on the part of Ericsson. Consequently, the Court grants defendants' motion for summary judgment as to plaintiff's Law 100 and Law 69 claims.[30]

## D. Law 115

Law 115 protects employees that collaborate in investigations or offer testimony before an administrative, judicial or legislative forum, from adverse actions by their employers. 29 L.P.R.A. § 194a. Much like Title VII and the ADA, Law 115 establishes a burden-shifting framework:

> The employee shall show proof of the violation through direct or circumstantial evidence. The employee shall furthermore establish a prima facie case of violation of the act by proving that he/she participated in an activity protected by §§ 194 et seq. of this title and that he/she was subsequently discharged, threatened or discriminated against regarding his/her employment. Once the aforesaid has been established, the employer shall claim and provide a nondiscriminatory legitimate reason for the discharge. Should the employer claim and provide such a reason, the employee should demonstrate that the alleged reason provided by the employer was a mere pretext for the discharge.

*Id.* at § 194a(c).

█ Here, assuming, *arguendo*, that plaintiff has made out a *prima facie* case, plaintiff's claim still fails. Since Ericsson has put forth a legitimate, non-discriminatory reason for terminating plaintiff, plaintiff is once again tripped up by the third requirement—a showing that Ericsson's alleged reason for terminating her was a pretext. Inasmuch as plaintiff has failed to make this showing, plaintiff's retaliation claim under Law 115 fails.

Based on the foregoing, defendants' motion for summary judgment as to plaintiff's Law 115 claim is granted.

## E. Article 1802

█ Under Article 1802 of Puerto Rico's Civil Code, recovery of tort dam-

---

**29.** As discussed above, *see supra* Section 8(b), Law 80 defines a dismissal without "just cause" as, *inter alia,* a dismissal based on a reason not permitted by the statute.

**30.** Inasmuch as the Court dismisses plaintiff's discrimination claim against defendants, it need to address plaintiff's individual liability claim under Law 100.

ages requires a showing that the defendant "by act or omission cause[d] damage to another through fault or negligence." 31 L.P.R.A. § 5141. The three essential elements for a negligence claim are: (1) evidence of physical or emotional injury, (2) a negligent or intentional act or omission (the breach of duty element), and (3) a sufficient causal nexus between the injury and defendant's act or omission (in other words, proximate cause). *See Torres v. KMart Corp.*, 233 F.Supp.2d 273, 277–78 (D.P.R.2002) (*citing Cintrón Adorno v. Gómez*, 147 D.P.R. 576, 598–99 (1999)). The breach of duty requirement set forth above has two sub-elements: duty and breach. *See Vázquez–Filippetti v. Banco Popular De Puerto Rico*, 504 F.3d 43, 49–50 (1st Cir.2007). The duty is generally defined by the rule that one must act as would a prudent and reasonable person under the circumstances. *See id.* Foreseeability is a component of the "breach" element because a defendant only breaches his duty if he acted—or failed to act—in a way that a reasonably prudent person would foresee as creating an undue risk. *See id.* In other words, defendant breaches the duty of care when his actions or omissions create reasonably foreseeable risks.

■ In the instant action, plaintiff seeks redress under Article 1802 for, *inter alia*, Ericsson's negligence in not adhering to the requirements of the ADA and Law 44. In this regard, to the extent plaintiff's failure to accommodate claims under the ADA and Law 44 survive, plaintiff's Article 1802 claim likewise survives as there are genuine issues of material fact as to whether Ericsson was negligent in not accommodating plaintiff.

Accordingly, defendants' motion for summary judgment with regards to plaintiff's Article 1802 claim is denied.

## V. Claims Not Covered in the R & R

In addition to the foregoing, the following claims were raised by defendants' in their motion for summary judgment, but were not addressed in the Magistrate–Judge's R & R. As such, the Court will address them in turn.

### 1. Retaliation Claims

While not addressed in the R & R, or the objections, defendants have moved for summary judgment—and plaintiff has responded—on plaintiff's claims for retaliation under both Title VII [31] and the ADA.

■ To make a *prima facie* case for retaliation under both Title VII and the ADA, a plaintiff must show that: (1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action. *See Calero–Cerezo v. U.S. Dept. Of Justice*, 355 F.3d 6, 25 (1st Cir.2004) (*citing Gu v. Boston Police Dep't.*, 312 F.3d 6, 14 (1st Cir.2002)); *see also Soileau v. Guilford of Maine*, 105 F.3d 12, 13 (1st Cir.1997) (applying the standard for a retaliation suit under Title VII to retaliation suit brought under the ADA). This *prima facie* case of retaliation has been described as a "small showing" that is "not onerous" and is "easily made." *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir.2003). Once the plaintiff establishes *prima facie* showing of retaliation, the burden-shifting analysis articulated in *McDonnell Douglas* applies. *See*

---

**31.** It bears noting that plaintiff has failed to put forth any evidence showing that she complained of, and was therefore retaliated against, based upon conduct protected by Title VII. However, in an effort to give plaintiff every benefit of the doubt, the Court will analyze her claim as if she had raised these claims—*i.e.*, gender, racial, or national origin discrimination—prior to being terminated.

*Calero–Cerezo,* 355 F.3d at 26. As previously discussed, under this framework, the defendant must articulate a legitimate and non-retaliatory reason for its employment decision. *Id.* If the defendant does so, the burden shifts to the plaintiff to show that "the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." *Id.*

■■■■ With regards to plaintiff's *prima facie* showing, defendants only contest plaintiff's ability to meet the third prong, plaintiff's ability to show a causal connection between the protected conduct and the adverse employment action. However, as the law makes clear, "[t]here are many sources of circumstantial evidence that … can demonstrate retaliation in a way sufficient to leap the summary judgment" hurdle. *Mesnick,* 950 F.2d at 828. One way is to show a close temporal proximity between the protected conduct and the adverse employment action. *Wyatt v. City of Boston,* 35 F.3d 13, 16 (1st Cir. 1994); *see also DeCaire v. Mukasey,* 530 F.3d 1, 19 (1st Cir.2008) (evidence of temporal proximity may be sufficient to make out a *prima facie* case of retaliation for exercise of rights protected under Title VII); *Mariani–Colón v. Dep't of Homeland Sec. ex rel. Chertoff,* 511 F.3d 216, 224 (1st Cir.2007) (finding temporal proximity between June of 2002 allegations of discrimination and August of 2002 termination sufficient to meet *prima facie* burden). Another is to show "[e]vidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action." *Che v. Mass. Bay Transp. Auth.,* 342 F.3d 31, 38 (1st Cir.2003) (*citing Kachmar v. SunGard Data Sys. Inc.,* 109 F.3d 173, 177 (3rd Cir.1997)). Here, based upon the closeness of plaintiff's filling, and subsequent amendment, of her EEOC complaint, and requests for accommodation, *see Freadman,* 484 F.3d at 106 (explaining that requesting an accommodation is protected conduct for purposes of the ADA's retaliation provision), with the date of her termination, the Court concludes that the "temporal proximity" between plaintiff's allegations of discrimination and her termination are sufficient to show a causal connection and, therefore, meet the relatively light burden of establishing a *prima facie* case of retaliation. *See Mariani–Colón,* 511 F.3d at 224; *Pomales,* 447 F.3d at 85; *Cardona v. United Parcel Service,* 79 F.Supp.2d 35 (D.P.R.2000) (explaining that the close temporal proximity between plaintiff's exercise of his rights under the ADA and defendant's termination of his employment shortly thereafter supports an inference of retaliation).

■■ Since plaintiff has made a *prima facie* showing of retaliation, the burden shifts to Ericsson to articulate a legitimate, non-retaliatory reason for their adverse employment decision. *See, e.g., Mesnick,* 950 F.2d at 827. As discussed above, Ericsson has met its burden by explaining and establishing that plaintiff was terminated due to a worldwide reorganization. Hence, Ericsson has articulated a legitimate and non-retaliatory justification for terminating plaintiff to an extent deemed sufficient to overcome plaintiff's *prima facie* case of retaliation.

As previously explained, plaintiff has proffered no evidence that the reasons offered by Ericsson for her termination are pretextual. While plaintiff engages in speculation and conjecture, that, in and of itself, is not enough to defeat a properly supported motion for summary judgment. *See Fontánez–Núñez v. Janssen Ortho LLC,* 447 F.3d 50, 55 (1st Cir.2006) (plaintiff may not rely on "conclusory allegations, or rank speculation" to defeat motion for summary judgment). Instead,

plaintiff needed to make a colorable showing that an adverse action was taken "for the purpose of retaliating" against her. *Randlett v. Shalala,* 118 F.3d 857, 862 (1st Cir.1997) (discussing Title VII); *see also Cruz v. McAllister Bros.,* 52 F.Supp.2d 269 (D.P.R.1999) (explaining that in order to maintain a retaliation claim under the ADA, plaintiff must adduce evidence that defendant's real motive for its actions were for the purpose of retaliating against him). As discussed, plaintiff has not made such a showing.

Based on the foregoing, defendants' motion for summary judgment as to plaintiff's retaliation claims is granted.

### 2. Damages Claim Pursuant to 42 U.S.C. § 1981a

Defendants also move for summary judgment with regards to plaintiff's section 1981a claim. In so doing, defendants argue that inasmuch as plaintiff does not have a claim under the ADA or Title VII, their section 1981a claim should be dismissed. However, as previously determined, plaintiff's failure to accommodate claim survives defendants' motion for summary judgment. As such, defendants' argument fails. Moreover, had defendant made a substantive challenge to plaintiff's section 1981a claim—i.e., that it acted in good faith to accommodate plaintiff—it too would have failed at this stage.

■■■■■ Under the ADA, an employer is not subject to punitive or compensatory damages if it "demonstrates good faith efforts, in consultation with the person with the disability who has informed the covered entity that accommodation is needed, to identify and make a reasonable accommodation that would provide such individual with an equally effective opportunity and would not cause an undue hardship on the operation of the business." 42 U.S.C. § 1981a(a)(2) & (3). Here, the evidence that suggests that Ericsson did not reasonably accommodate plaintiff, although certainly marginal, may also be probative of its lack of good faith. Accordingly, summary judgment as to plaintiff's section 1981a claim is inappropriate.

## VI. Conclusion

After careful consideration of the pleadings, record, the R & R and plaintiff's objections, the Court hereby **ADOPTS** the R & R in part, and **REJECTS** it in part. **Docket No. 74.** Moreover, to the extent not considered and addressed by the Magistrate–Judge, and upon examining the record, the Court **GRANTS** in part and **DENIES** in part defendants' motion for summary judgment with regards to the remaining state and retaliation. In summary, the Court rules as follows:

A. The Court **ADOPTS** the Magistrate–Judge's recommendation, thereby **GRANTING** defendants' motion for summary judgment as to plaintiff's individual liability claim under Title VII against López.

B. The Court **ADOPTS** the Magistrate–Judge's recommendation, thereby **GRANTING** defendants' motion for summary judgment as to plaintiff's ADA disability discrimination claim as it relates to her termination.

C. The Court **REJECTS** the Magistrate–Judge's recommendation, thereby **DENYING** defendants' motion for summary judgment as to plaintiff's failure to accommodate claim under the ADA.

D. The Court **ADOPTS** the Magistrate–Judge's recommendation, thereby **DISMISSING** plaintiff's hostile work environment claims.

E. The Court **ADOPTS** the Magistrate–Judge's recommendation,

thereby **GRANTING** defendants' motion for summary judgment as to plaintiff's Title VII discrimination claims.

F. The Court **ADOPTS** the Magistrate–Judge's recommendation, thereby **GRANTING** defendants' motion for summary judgment as to plaintiff's stock purchase plan and 401K plan claims.

G. The Court **GRANTS** in part (as it relates to disability discrimination) and **DENIES** in part (as it relates to the reasonable accommodation) defendants' motion for summary judgment as to plaintiff's Law 44 claim.

H. The Court **GRANTS** defendants' motion for summary judgment as to plaintiff's Law 80 (wrongful termination) claim.

I. The Court **GRANTS** defendants' motion for summary judgment as to plaintiff's Law 100 (discrimination) and Law 69 (gender discrimination) claims.

J. The Court **GRANTS** defendants' motion for summary judgment as to plaintiff's Law 115 claim.

K. The Court **DENIES** defendants' motion for summary judgment as to plaintiff's Article 1802 claim.

L. The Court **GRANTS** defendants' motion for summary judgment as to plaintiff's retaliation claims under the ADA and Title VII.

M. The Court **DENIES** defendants' motion for summary judgment as to plaintiff's section 1981a claim.

**SO ORDERED.**